**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
*Southern Division*

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | |
| v. | * | CRIMINAL CASE NO. PWG-14-587 |
| TERRENCE MULLEN, | * | (Civil Case No.: PWG-17-313)[1] |
| Defendant. | * | |
| | * | |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

## MEMORANDUM OPINION AND ORDER

Terrence Mullen was charged in a one-count indictment with interstate transportation of property taken by fraud, in violation of 18 U.S.C. § 2314. ECF No. 1. After initial representation by the Federal Public Defender's Office, Mullen retained defense attorney Russell Neverdon. ECF No. 20. On October 5, 2015, he pled guilty to the charge pursuant to a Plea Agreement that he signed and the Government filed on that same date, along with a Sealed Supplement. ECF Nos. 26, 27, 28. The parties agreed to an adjusted offense level of 22, which was reduced to 20 at sentencing based on a change to the United States Sentencing Guidelines ("USSG or Guidelines"). Sentencing Tr. 4, ECF No. 53. Further, they agreed that "the government would agree to a two-level reduction for acceptance of responsibility under Section 3E1.1A, plus an additional one point under 3E1.1B," which would reduce the adjusted offense level to 17 under the amended USSG. *Id.*

On March 25, 2016, I gave Mullen two points for acceptance of responsibility, rather than three, because the Government declined to make a motion to allow him the additional one

---

[1] The ECF Numbers cited herein refer to the documents filed in Defendant's criminal case.

point reduction pursuant to USSG § 3E 1.1(b). I calculated Mullen's adjusted offense level to be 18 and his criminal history to be category VI. *Id.* at 48. I sentenced Mullen to be imprisoned for a total term of 63 months, to begin on May 16, 2016. Jmt., ECF No. 47. I also imposed a supervised release term of three years and ordered Mullen to pay restitution in the amount of $414,682.89. *Id.*

Now pending is Mullen's Motion under 28 U.S.C. § 2255 to Vacate Set Aside, or Correct Sentence, ECF No. 55, accompanied by a Memorandum in Support, ECF No. 55-1. The Government filed an Opposition, ECF No. 62, and Mullen filed a Reply, ECF No. 70. He claims that his trial counsel, Russell Neverdon, was ineffective for failing to seek reductions in his adjusted offense level for mental and emotional conditions, pursuant to USSG § 5H1.3; for diminished capacity, pursuant to USSG § 5K2.13; and for overstatement of his criminal history, pursuant to USSG § 4A1.3. Def.'s Mem. 1. Yet, even assuming that Mullen's counsel's performance was not objectively reasonable, Mullen has not shown, with regard to these alleged shortcomings, "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *See Strickland v. Washington*, 466 U.S. 668, 694 (1984). Accordingly, I will deny his § 2255 Motion as to these claims.[2] As for his claim that his attorney "had a conflict of interest due to unpaid professional fees," while I agree that there was a conflict, I do not find that the conflict caused the attorney not to pursue a strategy that was both objectively reasonable and "clearly suggested by the circumstances." *See Mickens v. Taylor*, 240 F.3d 348, 361 (4th Cir. 2001), *aff'd,* 535 U.S. 162 (2002). Therefore, I will deny his § 2255 Motion as to that claim as well.

---

[2] While the Government also addresses a claim that defense counsel failed to discuss with Mullen a "two-level increase in offense level for relocating his scheme," Gov't Opp'n 9–10, Mullen clarifies in his Reply that "he did not include this as a cause of action against his counsel." Def.'s Reply 1. Therefore, I will not address it.

## **Background**

Mullen's sentencing was set for February 17, 2016, ECF No. 29, but at Neverdon's request, submitted the day before sentencing, the Court continued the sentencing to March 25, 2016. ECF Nos. 37, 38. Neverdon requested a second continuance to allow his client to undergo a psychological evaluation, once again filing the request the day before sentencing. ECF No. 41. I denied the request. ECF No. 43.

The Amended Presentence Investigation Report noted:

> According to his therapist, Dr. Peter DeNigris, the defendant has been attending weekly individual counseling sessions since October 24, 2015. Dr. DeNigris advised he never conducted a full evaluation of the defendant; however, he assessed him as being Bipolar. This diagnosis was later confirmed by Dr. Daniel Cowan, upon the defendant recently receiving a psychiatric evaluation. At this time, we have not obtained a copy of the psychiatric evaluation. However, according to Dr. DeNigris, the defendant was also prescribed Depakote for his condition.

PSR ¶ 52, ECF No. 34. Thus, Neverdon was aware of Mullen's disorder prior to sentencing. Yet he did not argue for a reduction in his client's adjusted offense level under USSG § 5H1.3 for a mental or emotional condition, or under USSG § 5K2.13 for diminished capacity. And, Dr. Cowan's psychiatric evaluation itself was not a part of the sentencing record. Nor had Mullen obtained the psychological evaluation he wished to present to the Court.

As the Government accurately noted, Mullen's mental health nonetheless was considered at length at sentencing:

> [T]he Court and defense counsel . . . devoted significant time and discussion at the sentencing hearing to [Mullen's] mental health. [Mullen's] counsel argued that the change in [Mullen's] life, from an "otherwise responsible" person to "someone who goes into this life of crime" around the age of 30 could be explained by his bipolar disorder. *Id*. at 19-20. Mr. Neverdon argued that [Mullen] "does have a problem. And it's not an excuse, but I believe that there is a problem. I believe that it affects how he thinks and perceives things," *id*. at 22, and asserted that with treatment [Mullen] had "greater clarity." *Id*. at 23. He also explained that, from his point of view, [Mullen's] mental health had likely

contributed to the conflict that they had experienced in their attorney-client relationship. *Id*. at 20-21. Mr. Neverdon requested that [Mullen] be permitted to self-surrender a few weeks after sentencing so that he could have a forensic psychological evaluation to help determine what services would be appropriate during [Mullen's] period of incarceration. *Id*. at 31-32.

[Mullen] addressed the Court as well, and acknowledged that his "record is atrocious and it's just a fact." *Id*. at 34. He linked his criminal history to his bipolar disorder, saying, "people really just don't understand that [he] was diagnosed with a mental illness" that has "ruined" his life. *Id*. at 34-35. [Mullen] told the Court that after being diagnosed and treated for his bipolar disorder "[t]his is the best I have felt in ten years," and "[t]he Depakote is great. The therapy is great." *Id*. at 36-37.

The Court carefully considered the impact that [Mullen's] mental health should have in determining the appropriate sentence. After a several-page discussion of the [Mullen's] mental health history, *see* [Sentencing Tr. 42–44], the Court stated:

> When I was preparing for the sentencing, I was going over the materials over the weekend and earlier this week, I took a look at Guideline Section 5H1.3, which is the mental and emotional condition policy statement and I want to refer to that just for a moment. It's not referred to in the Presentence Report or by counsel in their argument, but I thought it was important for me to look at it for my own.

> It says, mental and emotional conditions may be relevant in determining whether a departure is warranted if such conditions individually or in combination with other offender characteristics were present to an unusual degree and distinguished the case in the typical cases covered by the Guidelines. And it says that mental and emotional conditions may be relevant in determining conditions of probation or supervised release; e.g., participation in a mental health program.

> So I thought long and hard about this and I do believe that [Mullen's] mental health condition is highly relevant to treatment options during the period of time that [he is] serving [his] sentence and afterwards. And I couldn't agree more with Mr. Neverdon that it's very important as to whether when [he] come[s] out, [he] can get the stable treatment that puts this behind [him], because [he is] young enough to where [he has] got—[he] still ha[s] time to make a different [sic] in [his] son's life and to be—try to patch things up with [his] wife as well, but [he has] got to be the kind of person [he is] under Depakote, not the kind of person [he is] without it for that to work. So, I think that's relevant there.

> I don't see it as being present to such an unusual degree on the record before me that would cause me to give the departure,

4

> however, but it certainly is relevant in terms of treatment options. [Defense counsel is] absolutely right, I need to make sure that whatever sentence I have does put that into place.

*Id*. at 44-45.

> [Mullen's] criminal history added up to 23 points, placing him in criminal history category six. *Id*. at 9. The Court noted that "the criminal history, as everybody here has acknowledged goes back a long, long time," and while the Court recognized that [Mullen's] criminal history was likely tied to his mental health it stated that "nevertheless that's serious conduct and that has to stop in the future." *Id*. at 46.

Gov't Opp'n 4–6.

Psychiatrist Sean Hiscox, Ph.D. performed a psychological evaluation of Mullen on April 15, 2016 and provided a written evaluation. Psych. Eval., ECF No. 55-3. Of course, because this evaluation took place after sentencing, it also was not a part of the record at sentencing. Dr. Hiscox noted:

> Mr. Mullen has a prior criminal history in New Jersey for similar behavior and has served time in state prison and on probation. His history includes:
> • 2004: theft and theft by deception
> • 2005: receiving stolen property
> • 2006: theft by deception and theft by failure to make a required disposition
> • 2008: forgery, bad checks, theft by deception (two separate charges), and theft-illegal retention
> • 2009: theft by deception
> • 2010: theft by deception
> • 2013: unknown charges and disposition stemming from allegedly defrauding $75,000 from his employer[.]

*Id.* at 2. He observed that Mullen was "seeing Dr. DeNigris (who is [Dr. Hiscox's] colleague) for psychotherapy and Dr. Cowen for psychotropic medication," and that "Depakote . . . is a mood stabilizing medication." *Id*. Dr. Hiscox "reviewed the diagnostic criteria for Bipolar Disorders with Mr. Mullen" and found that "he meets the diagnostic criteria for Bipolar I Disorder, which means he has a history of manic and major depressive episodes." *Id.* at 3. Dr. Hiscox concluded:

Mr. Mullen has a long history of serious psychological problems stemming from Bipolar Disorder. His history includes mood instability, manic and depressive episodes, impulsive behavior, extremely poor judgment and decision making, impulse control problems, and grandiose thinking. His Bipolar Disorder went undiagnosed and treated for years. However, in October 2015 after seeking therapy through Pretrial Services, Dr. DeNigris diagnosed him with Bipolar Disorder, and then a psychiatrist, Dr. Cowen, confirmed the diagnosis and prescribed mood stabilizing medication (Depakote) and a sleep aid. Mr. Mullen's contact with Dr. DeNigris and Dr. Cowen is his first contact with mental health professionals.

Based on the present evaluation, I agree with Dr. DeNigris' and Dr. Cowen's diagnosis. I will further add that he meets the diagnostic criteria for Bipolar I Disorder, which means he has a history of manic and major depressive episodes . It is also my opinion that there is little doubt that the impaired reasoning, judgement, and deficient impulse control that are part of his Bipolar Disorder facilitated much his behavior in the present matter and many of his prior criminal acts. Although not rising to the level of a defense in my opinion, his Bipolar Disorder puts his chronic criminal behavior in context and should be viewed as a mitigating factor. If he continues to cooperate with his psychological and psychiatric treatment, which I believe he will, I see him as posing a low risk for engaging in similar criminal behavior in the future.

*Id.* at 5.

As for other reductions, as noted, in the Plea Agreement, the Government had agreed to a two-point reduction for acceptance of responsibility under § 3E1.1(a) and an additional one-point reduction for acceptance of responsibility under § 3E1.1(b). Sentencing Tr. 4. But, after interviewing Mullen, the probation officer "felt that his statement that he had legitimately planned to relocate here in Maryland and didn't intend to relocate here to hide the proceeds of the fraud was backing away from the Statement of Facts where that was acknowledged for calculation of the offense level." *Id.* at 5. On that basis, in the Amended Presentence Investigation Report, the probation officer "recommended there be no acceptance of responsibility credit at all whether under 3E1.1A or B." *Id.* And, the Government "essentially, said, well, we -- we are concerned a little bit because we firmly believe that there was a relocation to Maryland for that purpose." *Id.* The Government "offered as a compromise

position that rather than deprive the defendant, Mr. Mullen, of all three acceptance of responsibility points that [it] would simply not make the motion under 3E1.1B, but allow it under 3E1.1A." *Id.* Because the Guidelines require a motion from the Government for a departure under § 3E1.1(b), *see* USSG § 3E1.1(b), I only awarded a two-point reduction for acceptance of responsibility, pursuant to § 3E1.1(a). *See* Sentencing Tr. 4–5, 7–8.

## **Ineffective Assistance of Counsel – Failure to Seek Reductions**

### *Standard of Review*

28 U.S.C. § 2255(a) permits a prisoner to file a motion to vacate, set aside or correct his sentence on the ground that it "was imposed in violation of the Constitution or laws of the United States . . . ." The prisoner must prove his case by a preponderance of the evidence. *Brown v. United States*, Civil No. DKC-10-2569 & Crim. No. DKC-08-529, 2013 WL 4562276, at *5 (D. Md. Aug. 27, 2013). If the court finds for the prisoner, "the court shall vacate and set the judgment aside and shall discharge the prisoner or resentence him or grant a new trial or correct the sentence as may appear appropriate." 28 U.S.C. § 2255(b). Although "a *pro se* movant is entitled to have his arguments reviewed with appropriate deference," the Court may summarily deny the motion without a hearing "if the § 2255 motion, along with the files and records of the case, conclusively shows that [the prisoner] is not entitled to relief." *Brown*, 2013 WL 4562276, at *5 (citing *Gordon v. Leeke*, 574 F.2d 1147, 1151–53 (4th Cir.1978); 28 U.S.C. § 2255(b)).

Mullen claims that Neverdon was ineffective for failing to seek reductions in his adjusted offense level for mental and emotional conditions, pursuant to USSG § 5H1.3; for diminished capacity, pursuant to USSG § 5K2.13; and for overstatement of his criminal history, pursuant to USSG § 4A1.3. Def.'s Mem. 1. In his view, his attorney should have obtained Dr. Hiscox's report prior to sentencing, as Mullen had requested, and used it to argue that Mullen had mental

and emotional conditions and a diminished capacity and that his criminal history was overstated, all based on his Bipolar 1 diagnosis. *Id.* at 14–19.

To prevail on a claim of ineffective assistance of counsel as the alleged Constitutional violation,

> [t]he petitioner must show that counsel's performance was constitutionally deficient to the extent that it fell below an objective standard of reasonableness, and that he was prejudiced thereby. *Strickland v. Washington*, 466 U.S. 668, 687–91 (1984). In making this determination, there is a strong presumption that counsel's conduct was within the wide range of reasonable professional assistance. *Id.* at 689; *see also Fields v. Attorney Gen. of Md.*, 956 F.2d 1290, 1297–99 (4th Cir. 1992). Furthermore, the petitioner "bears the burden of proving *Strickland* prejudice." *Fields*, 956 F.2d at 1297.

*United States v. Lomax*, Civil No. WMN-13-2375 & Crim. No. WMN-10-145, 2014 WL 1340065, at *2 (D. Md. Apr. 2, 2014).

To show prejudice, the defendant must demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *See Strickland v. Washington*, 466 U.S. 668, 694 (1984). A probability is reasonable if it is "sufficient to undermine confidence in the outcome." *Id.* Additionally, the defendant must show that "the 'result of the proceeding was fundamentally unfair or unreliable.'" *Lomax*, 2014 WL 1340065, at *2 (quoting *Sexton v. French*, 163 F.3d 874, 882 (4th Cir. 1998) (quoting *Lockhard v. Fretwell*, 506 U.S. 364, 369 (1993))); *see also Lockhart*, 506 U.S. at 369 ("[A]n analysis focusing solely on mere outcome determination, without attention to whether the result of the proceeding was fundamentally unfair or unreliable, is defective."). If the defendant fails to show prejudice, the Court need not consider the performance prong. *Id.*

Mullen argues that his attorney should have obtained a psychological evaluation of him prior to sentencing, presented it to the Court, and based on the evaluation, sought a reduction in his sentence pursuant to three separate Guidelines provisions. Section 5H1.3 provides:

> Mental and emotional conditions may be relevant in determining whether a departure is warranted, if such conditions, individually or in combination with other offender characteristics, are present to an unusual degree and distinguish the case from the typical cases covered by the guidelines. See also Chapter Five, Part K, Subpart 2 (Other Grounds for Departure).
>
> Mental and emotional conditions may be relevant in determining the conditions of probation or supervised release; e.g., participation in a mental health program . . . .

Section 5K2.13 provides:

> A downward departure [from offense level] may be warranted if (1) the defendant committed the offense while suffering from a significantly reduced mental capacity; and (2) the significantly reduced mental capacity contributed substantially to the commission of the offense. Similarly, if a departure is warranted under this policy statement, the extent of the departure should reflect the extent to which the reduced mental capacity contributed to the commission of the offense.
>
> However, the court may not depart below the applicable guideline range if (1) the significantly reduced mental capacity was caused by the voluntary use of drugs or other intoxicants; (2) the facts and circumstances of the defendant's offense indicate a need to protect the public because the offense involved actual violence or a serious threat of violence; (3) the defendant's criminal history indicates a need to incarcerate the defendant to protect the public; or (4) the defendant has been convicted of an offense under chapter 71, 109A, 110, or 117, of title 18, United States Code.

"'[D]iminished capacity' departures pursuant to § 5K2.13 are a subset of departures allowed under § 5H1.3 based on mental and emotional conditions." *United States v. Sheehan*, 371 F.3d 1213, 1218 (10th Cir. 2004). Section 4A1.3(b)(1) provides:

> Standard for Downward Departure [from criminal history category].--If reliable information indicates that the defendant's criminal history category substantially over-represents the seriousness of the defendant's criminal history or the likelihood that the defendant will commit other crimes, a downward departure may be warranted.

While distinct, these three guidelines provisions deal with the same general subject matter—the defendant's mental status and how it should affect the sentence ultimately imposed by the court—and they overlap considerably.

It is true that Neverdon did not obtain a full psychological evaluation of Mullen before sentencing, and after sentencing, Dr. Hiscox opined that Mullen's "Bipolar Disorder puts his chronic criminal behavior in context and should be viewed as a mitigating factor."  Psych. Eval. 5.  But, even though I did not have the evaluation, I was aware of his Bipolar Disorder (the symptoms of which are widely known and were well familiar to me) at sentencing, based on the Amended Presentence Investigation Report, prepared November 17, 2015 and revised December 10, 2015, well in advance of sentencing; defense counsel's statements at sentencing about the disorder and his contention that Mullen's disorder "affects how he thinks and perceives things," Sentencing Tr. 22; and Mullen's own testimony explaining how his disorder affected the choices he made and the actions he took, *id.* at 35.  Mullen testified:

> [M]y record is atrocious and it's just a fact. But what I would say is that people really just don't understand that I was diagnosed with a mental illness and it's a fact. It's not something that I'm just -- I got in trouble and so now I'm coming in here saying this.
>
> This thing has ruined my life, ruined it. My family is here. They can tell you. By the time I was 23 years old, I had a house in the suburbs, a car, made my car payments on time, everything right. Never been in trouble in my life, never. And this -- you know, went about my life like that. To my son, I was a hero. I never had any problems.
>
> And then all of a sudden, things just changed. It wasn't like -- it wasn't drugs, it wasn't anything like that. It's just I would -- I've never once done any of these things with the intention of stealing. Never once was that the intent. Like, you would never see something like, you know, that I'd possibly get away with. All these things I do, clearly if I don't pay the money back, I'm going to get caught.
>
> There isn't -- like, there isn't an out. It's not like bank robbery or selling drugs. Oh, maybe I can get away with this. It's clear, like, even in this case, okay, I used a fake name, but the e-mail is registered in my name, the warehouse is rented with my ID, my name. I know that if I don't pay, I'm going to get caught,

> but at the time it's just like I'm going a million miles an hour and, you know -- and then it happens and then I just fall into a deep depression, which is part – I didn't know, but which is part of the cycle of bipolar . . . .

*Id*. at 34–36.  He insisted that he "would never, ever, ever purposely steal."  *Id*. at 38.  And, Mullen informed me of his belief that I should consider a full psychiatric evaluation of him before sentencing him:

> [U]nfortunately, what I know from my psychiatrist, I guess, cannot be shared with you because it was through pre-trial. They're not allowed to share their findings and all, but I think that it would be imperative that the Court really understand what I'm going through.

*Id*. Although Dr. Hiscox's evaluation discussed Mullen's symptoms with greater medical specificity, the diagnosis reached and its underlying manifestation in Mullen's behavior were substantially similar to those described by Mullen and Neverdon during sentencing.  Dr. Hiscox's report, therefore, was cumulative to the information I already had at the time of sentencing.

Further, Mullen never raised competency[3] or the defense of insanity[4] (and does not argue now that his counsel was ineffective for failing to do so); he only argues that his allegedly mental condition, causing diminished capacity and an overstatement of his criminal history, was a ground for departure that should have been raised by his attorney at sentencing.

---

[3] *See* 18 U.S.C. § 4241(a) ("At any time after the commencement of a prosecution for an offense and prior to the sentencing of the defendant, . . . the defendant . . . may file a motion for a hearing to determine the mental competency of the defendant" to determine if "the defendant is presently suffering from a mental disease or defenct rendering him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense . . . .").

[4] *See* 18 U.S.C. § 17 ("It is an affirmative defense to a prosecution under any Federal statute that, at the time of the commission of the acts constituting the offense, the defendant, as a result of a severe mental disease or defect, was unable to appreciate the nature and quality of the wrongfulness of his acts.").

I carefully considered Mullen's Bipolar Disorder and USSG § 5H1.3 specifically at sentencing. As noted, "'[d]iminished capacity' departures pursuant to § 5K2.13 are a subset of departures allowed under § 5H1.3 based on mental and emotional conditions." *United States v. Sheehan*, 371 F.3d 1213, 1218 (10th Cir. 2004). Therefore, even though I did not refer to § 5K2.13 specifically, my discussion of § 5H1.3 and Mullen's mental health status in general took into consideration the factors that § 5K2.13 addresses. I concluded that Mullen's "mental health condition is highly relevant to treatment options during the period of time that [he is] serving [his] sentence and afterwards." Sentencing Tr. 45. And I found that "the criminal history . . . [d]oes tie in that bipolar." *Id.* at 46. But, I did not see the condition "as being present to such an unusual degree on the record before me that would cause me to give the departure." *Id*. at 45. Further, Dr. Hiscox did not find that Mullen's mental capacity was "significantly reduced," let alone that he had a "significantly reduced mental capacity [that] contributed substantially to the commission of the offense." *See* USSG § 5K2.13. Rather, he opined that "the impaired reasoning, judgement, and deficient impulse control that are part of his Bipolar Disorder facilitated much his behavior in the present matter" but did "not ris[e] to the level of a defense . . . ." Psych. Eval. 5.

In determining the sentence, I noted that his criminal history was "serious conduct . . . that has to stop in the future," that "I ha[d] to make sure that the sentence that I impose[d] is a deterrent to [Mullen] and others, so that they don't think it's easy money," and that "I ha[d] to make sure that the sentence promotes respect for law and order, and protects the public," as well as "consider[ing] treatment options and how I [could] accomplish that." *Id*. at 46. Under these conditions, I would not have reduced either Mullen's offense level under § 5H1.3 or § 5K2.13 or his criminal history category under § 4E1.1(b), even if I had Dr. Hiscox's evaluation before me.

I calculated Mullen's offense level to be 18, criminal history category VI, with a guidelines range of 57–71 months. *Id.* at 48. And, although the Government recommended the maximum amount, I sentenced Mullen to 63 months. *Id.* at 47. I reasoned that he only received a two-point reduction for acceptance of responsibility and, but for his disorder, he may have received the full three-point reduction, reducing his level to 17 and the guidelines range to 51–63 months. *Id.* Thus, although he did not receive a reduction under USSG §§ 4A1.3, 5H1.3, or 5K2.13, I did take his disorder into account in sentencing him toward the bottom of the guidelines range, rather than at the Government's recommended maximum sentence. *See id.* Moreover, I stated explicitly that "I would give that sentence even if I gave him the third [point under § 3E1.1]." Sentencing Tr. 54. As a result, Mullen received the sentence he would have received had I reduced his offense level to 17 under § 5H1.3 or § 5K2.13, and the sentence he would have received had I reduced his criminal history points by even as many as 11 points, to bring his criminal history category down to V, as the sentencing range for both offense level 17, criminal history category VI and offense level 18, criminal history category V is 51–63 months, the same range as if I had given him the third point under § 3E1.1(b).

And, with regard to a reduction for overstatement of criminal history pursuant to USSG § 4A1.3, it is noteworthy that Mullen first was arrested in 2004 and sentenced in 2006; by 2010, he had been arrested and convicted eight times on a total of fourteen counts, each time receiving a sentence of one year or more. PSR ¶¶ 30–37. A criminal history category VI applies when a defendant has 13 points or more, and Mullen's criminal history totaled 23 points. *Id*. at 9. Given the extent of Mullen's criminal history, the claim is frivolous. *See Sellman v. United States*, 92 F. Supp. 2d 475, 480 (D. Md. 2000) ("Secondly, he argues that counsel should have requested a departure pursuant to United States Sentencing Guidelines (herein USSG) § 4A1.3 for over-

representation of criminal history. This claim is frivolous, for at the time of sentencing Sellman's criminal history spanned close to twenty years and included twelve prior offenses, two of which were violent felonies. This is hardly the type of situation the authors of the Guidelines envisioned when drafting § 4A1.3. In fact, the guideline manual reads: "An example [of overstated criminal history] might include the case of a defendant with two misdemeanor convictions close to ten years prior to the instant offense and no other evidence of prior criminal behavior in the intervening period." USSG § 4A1.3. Sellman's criminal history does not closely resemble this scenario; therefore, his claim is denied.").

There is no reasonable probability that, had defense counsel obtained the psychological evaluation prior to sentencing or sought a reduction under USSG §§ 4A1.3, 5H1.3, or 5K2.13, Mullen's sentence would have been different. *See Strickland v. Washington*, 466 U.S. 668, 694 (1984). The sentence was not "fundamentally unfair or unreliable," as I was aware of, and considered, Mullen's Bipolar Disorder in sentencing him; ordered a sentence toward the bottom of the guidelines range, in part because of the possible effects of Mullen's disorder; and declined to reduce his sentence further based on the disorder. *See Lockhard v. Fretwell*, 506 U.S. 364, 369 (1993); *Sexton v. French*, 163 F.3d 874, 882 (4th Cir. 1998); *United States v. Lomax*, Civil No. WMN-13-2375 & Crim. No. WMN-10-145, 2014 WL 1340065, at *2 (D. Md. Apr. 2, 2014). Mullen argues that, "[h]ad the District Court had Dr. Hiscox's report available to it, it would have known that the Petitioner suffered from 'impaired reasoning, judgment, and deficient impulse control" and therefore "clearly met this Circuit's standard for a [USSG § 5K2.13] departure." Def.'s Mem. 18. Yet, these characteristics are symptoms of Bipolar Disorder, not unique to Mullen, such that the diagnosis sufficed without the full evaluation. *See* https://www.mayoclinic.org/diseases-conditions/bipolar-disorder/symptoms-causes/syc-

20355955 ("Bipolar disorder, formerly called manic depression, is a mental health condition that causes extreme mood swings that include emotional highs (mania or hypomania) and lows (depression). . . . The[] mood swings can affect sleep, energy, activity, judgment, behavior and the ability to think clearly."). Therefore, Mullen cannot show prejudice. *See Strickland*, 466 U.S. at 694; *Lockhard*, 506 U.S. at 369; *Sexton*, 163 F.3d at 882; *Lomax*, 2014 WL 1340065, at *2.

## **Ineffective Assistance of Counsel – Conflict of Interest**

### *Standard of Review*

While *Strickland* is often the appropriate test to apply for post-conviction challenges, a defendant who can show that a "conflict of interest actually affected the adequacy of his representation need not demonstrate prejudice in order to obtain relief," because the prejudice is presumed. *Cuyler v. Sullivan*, 446 U.S. 335, 349–50 (1980) (citing *Holloway v. Arkansas*, 435 U.S. 475, 487–91 (1978)). The *Strickland* Court reaffirmed the *Cuyler* standard because, "[g]iven the obligation of counsel to avoid conflicts of interest and the ability of trial courts to make early inquiry in certain situations likely to give rise to conflicts, . . . it is reasonable for the criminal justice system to maintain a fairly rigid rule of presumed prejudice for conflicts of interest." *Strickland*, 466 U.S. at 692 (citing *Cuyler*, 446 U.S. at 350).

For a defendant to obtain relief under the *Cuyler* standard, he "must demonstrate 'an actual conflict of interest' that 'result[s] in an adverse effect on counsel's performance.'" *United States v. Stitt*, 552 F.3d 345, 350 (4th Cir. 2008) (quoting *United States v. Tatum,* 943 F.2d 370, 375 (4th Cir. 1991) (emphasis omitted)). While "[t]hese requirements 'are often intertwined[,]' . . . an '[a]dverse effect cannot be presumed from the mere existence of a conflict of interest.'" *Id.* (quoting *id.*; *Rubin v. Gee,* 292 F.3d 396, 401 (4th Cir. 2002)). However, "[a]n 'actual conflict,' for Sixth Amendment purposes, is a conflict of interest that adversely affects counsel's

performance." *Mickens v. Taylor*, 535 U.S. 162, 172 n.5 (2002) (emphasis added); *accord Rubin v. Gee*, 292 F.3d 396, 401–02 (4th Cir. 2002).

To be successful, a defendant must: (1) "identify a plausible alternative defense strategy or tactic that his defense counsel might have pursued;" (2) "show that the alternative strategy or tactic was objectively reasonable under the facts of the case known to the attorney at the time of the attorney's tactical decision" and was "clearly suggested by the circumstances;" and (3) "establish that the defense counsel's failure to pursue that strategy or tactic was linked to the actual conflict." *Mickens v. Taylor*, 240 F.3d 348, 361 (4th Cir. 2001), *aff'd,* 535 U.S. 162 (2002); *see Tatum,* 943 F.2d at 376. The third prong can be proven "(1) by 'establish[ing] that the alternative defense was inherently in conflict with . . . the attorney's other loyalties or interests' . . . , or (2) by otherwise showing that the alternative defense was 'not undertaken due to' those other loyalties or interests . . . ." *United States v. Nicholson*, 611 F.3d 191, 212 (4th Cir. 2010) (quoting *Freund v. Butterworth*, 165 F.3d 839, 860 (11th Cir. 1999)) (alterations in original).

Mullen claims that Neverdon "had a conflict of interest due to unpaid professional fees." Def.'s Mem. 1. "A fee dispute does not ordinarily establish an actual conflict because courts 'presume that counsel will continue to execute [their] professional and ethical duty to zealously represent [their] client[s], notwithstanding the fee dispute.'" *United States v. Oliver*, 406 F. App'x 808, 811–12 (4th Cir. 2011) (quoting *United States v. O'Neil,* 118 F.3d 65, 72 (2d Cir. 1997)). Nonetheless, "under *Stitt*, if an actual financial conflict is established, *Cuyler* is the appropriate framework to apply to [the] claim." *Moore v. United States*, No. TDC-10-0648, 2017 WL 3738440, at *4 (D. Md. Aug. 29, 2017) (citing *Oliver*, 406 Fed. App'x at 811); *see also Stitt*, 552 F.3d at 350, 351 n.4 (applying the *Cuyler* standard when a petitioner alleged that

his attorney failed to travel out-of-state to investigate because the fee agreement stated that all investigation costs would be out of the attorney's pocket; denying relief because no actual conflict of interest was proven).

## *Discussion*

According to Mullen, Neverdon spoke with a family member of his and agreed to represent him for $7,500 but, when he met with Neverdon, he stated that his fee was $15,000. Def.'s Mem. 1–2. Mullen paid him $5,000 in cash and gave him a post-dated check, which was never negotiated. *Id.* at 2. Mullen admits that he did not pay Neverdon in full. *See id.*

Mullen alleges that, because he had outstanding attorney's fees, his trial counsel refused to secure a psychological evaluation of him to mitigate his sentence. Def.'s Mem. 1, 20. Mullen offers evidence that on February 10, 2016, he provided Dr. Hiscox's contact information to Neverdon, stating: "Again that's the evaluation I need done b4 sentencing." Def.'s Mem. 8 (quoting Text Msg., Ex. A-1, ECF No. 55-2). It is unclear when Mullen first told Neverdon that he wanted an evaluation. As of February 15, 2016, two days before the original sentencing date, Neverdon had not contacted Dr. Hiscox. *Id.* at 9 (quoting Text Msg., Ex. A-3). The attorney explained that his work was delayed because his "aunt who helped raise" him had passed away, and he was requesting a continuance of the sentencing date. *Id.* (quoting Text Msg., Ex. A-4).

Neverdon informed Mullen that they "need[ed] to speak before [Neverdon could] call [Mullen's] doctor." *Id.* at 10 (quoting Text Msg., Ex. A-7). Mullen and his attorney agreed to speak on February 24, 2016, and that morning, the attorney texted Mullen, asking if he "ha[d] [his] fees." *Id.* (quoting Text Msg., Ex. A-8). The following exchange ensued:

> The Petitioner: As I told you the fees are no longer an issue. We need to have a discussion to make sure we are on the same page as long as we are on the same page you will get your money and very very short order.

Mr. Neverdon:    Dude  this is some   more of  your stuff   ...  I don't know why  I find myself still caught up with   you.  You  were   charged 15k, period. Then  what I don't do  is  negotiate my  fees, and  I did, and  we  set  a price separate to  work a plea  ONLY. I have  dealt with  non payment, excuses after excuses, story after story and  one  bad   situation after the next. The  scenario never ceases and  now  requests to consistently try  and  get  the government to  work  with you  and  factoring in  your circumstances and  yet there  is another list of what you  would like  to  see  happen, extended turn in,  reduced guidelines, modified pre-trial and  access to  your son  and  now  additional specialized therapy which would require an additional extension.  I will see  you shortly and  we  can  quickly go over  what you  are  now attempting to  do in  usurping the  process. There is no same sheet of music, your options have always been the  same and  I get  you want to  find  some loophole, but  I am focused on  a viable and  realistic approach and  wrapping  this  case up.  It is going to  end  as  it  has  started and  the  writing is on  the  wall and I blame no  one  but  myself. All I can do is laugh!

*Id*. at 10 (quoting Text Msg., Ex. A-9 – A-10).

Neverdone told Mullen: "You have not gotten an evaluation because you looked up this loophole, you set this into play and you could not provide me with any medical justification to contact someone to set something up and *moreover, given your habitual lying problem, I sure as hell would not trust that I would not be financially obligating myself to yet another scheme*." Text Msg., Ex. A-14 (emphasis added).  Neverdon stated that it was "NOT [counsel's] place to request a forensic evaluation when there had been NO presentation or recommendation [from] any licensed clinician."  Text Msg., Ex. A-17.  The attorney asserted: "I asked for that which is beyond the scope of representation . . . . You need to pay your balance."  *Id.*  In Mullen's view, his attorney "admits that he has delayed calling the Petitioner's 'treating clinician' due to the Petitioner's non-payment of fees," because when Mullen noted that it took Neverdon "several months" to request the evaluation, Neverdon responded that he had "asked for the legal fees to be addressed for almost a year." Def.'s Mem. 12 (quoting Text Msg., Ex. A-18).

It is clear from this correspondence that a conflict existed: Mullen's fee payments were overdue, and his attorney wanted him to pay.  Further, it appears that Neverdon did not believe

statements Mullen made to him.  As for whether the conflict adversely affected the attorney's performance, as noted, Mullen must  (1) "identify a plausible alternative defense strategy or tactic that his defense counsel might have pursued;" (2) "show that the alternative strategy or tactic was objectively reasonable under the facts of the case known to the attorney at the time of the attorney's tactical decision" and was "clearly suggested by the circumstances;" and (3) "establish that the defense counsel's failure to pursue that strategy or tactic was linked to the actual conflict."  *Mickens*, 240 F.3d at 361.

Mullen has identified a plausible alternative defense strategy: Neverdon could have promptly scheduled a psychological evaluation when Mullen requested one.  And, Mullen offers photographs of text messages in which Neverdon told him: "You have not gotten an evaluation because you looked up this loophole, you set this into play and you could not provide me with any medical justification to contact someone to set something up and moreover, given your habitual lying problem, I sure as hell would not trust that I would not be financially obligating myself to yet another scheme." Text Msg., Ex. A-14.  Based on these photographs, Neverdon did not set up the psychological evaluation for two reasons, one of which was the conflict of interest. Thus, Mullen has established a link between the conflict and Neverdon's failure to schedule the evaluation.

But, despite the acrimonious attorney–client relationship and the fact that their conflicts resulted in Mullen not timely receiving the evaluation he requested, the strategy Mullen proposed was neither objectively reasonable nor clearly suggested by the circumstances.  Certainly, counsel was aware that Mullen had been diagnosed with Bipolar Disorder and was being treated by a psychiatrist, who prescribed psychotropic medication. Yet, even though a full psychological evaluation was not available to the Court, information about Mullen's diagnosis and medication

already was before the Court, as it had been included in the Amended Presentence Investigation Report. Given that information before the Court was sufficient to prompt the Court to consider, *sua sponte*, whether Mullen's offense level should be reduced because of his Bipolar Disorder, Mullen has not shown that, under the circumstances, it would be reasonable to obtain a full psychological evaluation or that the need for such an evaluation was "clearly suggested." *See Mickens*, 240 F.3d at 361. Accordingly, Mullen's Motion is denied on this basis as well.

**Conclusion**

Mullen's § 2255 Motion IS DENIED. Because I am dismissing Mullen's habeas petition, I must issue or deny a certificate of appealability ("COA"). "A COA may issue 'only if the applicant has made a substantial showing of the denial of a constitutional right.'" *Marks v. Barnett*, No. ELH-17-213, 2017 WL 6368660, at *8 (D. Md. Dec. 13, 2017) (quoting 28 U.S.C. § 2253(c)(2)); *see Buck v. Davis*, ___ U.S. ___, 137 S. Ct. 759, 773 (2017). To make this showing, the petitioner must "demonstrate[e] that reasonable jurists could find the court's assessment of the constitutional claims debatable or wrong." *Id.* (quoting *Tennard v. Dretke*, 542 U.S. 274, 282 (2004) (quoting *Slack v. McDaniel*, 529 U.S. 473, 484 (2000))). Under the circumstances of this case, I believe that reasonable jurists could question my assessment of the constitutional claims. Therefore, in an abundance of caution, I will certify Mullen's entitlement to appeal. *See id.*; *see also Buck*, 137 S. Ct. at 773; *Tennard*, 542 U.S. at 282; *Slack*, 529 U.S. at 484.

**ORDER**

For the reasons stated above, it is, this 23rd  day of January, 2018, hereby ORDERED that

1. Mullen's § 2255 Motion, ECF No. 55, IS DENIED; and

2. A Certificate of Appealability IS ISSUED; and

3. The Clerk is directed to file a copy of this Memorandum Opinion and Order in Criminal No. PWG-14-587 and Civil Action No. PWG-17-313, to MAIL a copy of it to Mullen and the Government, and to CLOSE Civil Action No. PWG-17-313.


_____/S/_____
Paul W. Grimm
United States District Judge